[947 NYS2d 120]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CLAU-
DIO PICCA, Appellant.

Second Department, June 6, 2012

**APPEARANCES OF COUNSEL**

*Lynn W. L. Fahey*, New York City, for appellant.

*Charles J. Hynes, District Attorney*, Brooklyn (*Leonard Joblove* and S*hulamit Rosenblum Nemec* of counsel), for respondent.

**OPINION OF THE COURT**

SKELOS, J.P.

In *Padilla v Kentucky* (559 US —, 130 S Ct 1473 [2010]), the United States Supreme Court determined that a criminal defendant whose attorney failed to provide advice as to the immigration consequences of his plea of guilty received representation falling below an objective standard of reasonableness. The Court declined, however, to determine in the first instance whether the defendant was prejudiced by counsel's error and, thus, whether the defendant was entitled to relief on his ineffective assistance of counsel claim (559 US at —, 130 S Ct at 1483-1484). Instead, the Court remitted the matter to the courts

of Kentucky for a determination of the question of prejudice (*id.*). In the present case, the defendant similarly alleges that his counsel failed to advise him that he would be subject to removal from the United States pursuant to federal immigration statutes as a consequence of his plea of guilty, and, therefore, he was deprived of his right to counsel under the Sixth Amendment to the United States Constitution. The main issue presented is whether the Supreme Court, Kings County, erred in summarily determining that, had the defendant been so advised, he could not rationally have decided to reject the People's plea offer, and, therefore, that he could not demonstrate that he was prejudiced by counsel's error. We hold that the defendant sufficiently alleged that a decision to reject the People's plea offer would have been rational, and, thus, that the Supreme Court erred in failing to conduct a hearing on the defendant's motion.

The defendant was born in 1961 in Italy. He left Italy at the age of three, and resided with his family in France until, when he was nine years old, he immigrated with his parents and siblings to the United States. A lawful permanent resident, the defendant worked for 13 years as a clerk in the commodities market, for five years as a school custodian, and later as a construction laborer. He met his wife, an American citizen, in 1978, and has been married to her for more than 20 years. The defendant and his wife have three sons, who were born, and reside, in the United States.

The defendant began using alcohol and marijuana at the age of 14. He subsequently developed a dependency on cocaine and heroin. Although he enrolled himself in, and participated in, several rehabilitation programs and other substance abuse treatment programs throughout the years, he was unable to maintain sobriety. In 1997, the defendant was convicted of attempted criminal sale of a controlled substance in the third degree, and was sentenced to time served and probation, from which he was granted an early discharge.

In 2001, a criminal complaint was filed against the defendant, alleging that, on April 17, 2001, at approximately 6:30 A.M., Detective Eric Curtis of the New York City Police Department observed an individual approach the defendant on a street in Brooklyn, give the defendant a sum of money, and receive from the defendant a quantity of heroin. According to the complaint, Detective Curtis thereafter apprehended the individual to whom the defendant allegedly sold drugs, and recovered the drugs from him. The complaint further alleged that Detective Curtis

arrested the defendant and similarly recovered from the defendant's person a quantity of heroin. Accordingly, the complaint alleged, the defendant had twice committed the offenses of criminal possession of a controlled substance in the seventh degree and criminal possession of a controlled substance in the third degree, and once committed the offense of criminal sale of a controlled substance in the third degree. The People additionally filed a notice pursuant to CPL 710.30 (1) (a), declaring their intent to present evidence at trial that, at the scene of his arrest, the defendant stated to the arresting officer: "I'll be honest with you, I've got three bundles in my underwear"; and that, at the precinct, he stated to that officer: "This is the money I got for selling drugs . . . I'm guilty, I'm sorry, but I'm doing this to support my habit."

On August 6, 2001, the defendant, represented by a now-deceased attorney then employed by Brooklyn Defender Services, pleaded guilty to attempted criminal sale of a controlled substance in the third degree, in exchange for placement in the Kings County District Attorney's Drug Treatment Alternative-to-Prison (hereinafter DTAP) program. At the time of the plea, the Supreme Court promised that it would vacate the plea and dismiss the indictment, provided the defendant successfully completed the program. If the defendant failed to complete the program, however, or violated other specified conditions, he would be sentenced to an indeterminate term of imprisonment of 4 to 8 years. Although the defendant successfully completed the residential treatment portion of the program, he relapsed while enrolled in an outpatient program. Before the Supreme Court could determine whether the defendant should be given another opportunity to obtain treatment, an immigration detainer was placed on him by United States Immigration and Customs Enforcement (hereinafter ICE), preventing the defendant's further placement in a treatment program.

On September 20, 2005, the defendant, represented by a second attorney from Brooklyn Defender Services, appeared for sentencing. At that time, defense counsel informed the Supreme Court that, when the defendant pleaded guilty, the defendant "really had no idea that there were any immigration consequences to the taking of the plea." On that basis, the defendant moved to vacate his plea. The Supreme Court denied the motion, and sentenced the defendant to an indeterminate term of imprisonment of 3 to 6 years.

The defendant appealed from the judgment of conviction, and, before that appeal was perfected in this Court, moved in

the Supreme Court pursuant to CPL 440.10 to vacate the judgment on the ground, inter alia, that he was denied his right under the Sixth Amendment to the effective assistance of counsel by his attorney's failure to advise him of the removal consequences of his plea of guilty. In support of his motion, the defendant submitted an affidavit, in which he averred that, when he pleaded guilty, he was unaware that doing so could result in his removal from the United States because his attorney never so advised him. When the immigration detainer was placed on him, the defendant asserted, he thought that "it was a minor matter relating to [his] green card." It was only when his wife consulted with an immigration attorney that the defendant learned that his plea of guilty could lead to removal. According to the defendant, he told his counsel that he wanted to withdraw his plea of guilty "[a]s soon as he learned" of this consequence, and, he averred, he never would have pleaded guilty had he known that the plea could result in his removal from the United States. Although the defendant's trial counsel and his appellate counsel both explained to him that he would again face the charges against him were he to withdraw his plea, and that he could be sentenced to more prison time than he had already served, the defendant asserted that he still wanted to withdraw his plea because "[his] biggest concern was avoiding deportation, not what sentence [he] would get." In that regard, the defendant explained:

> "I left Italy when I was only 3 years old. I have never been back to Italy since, even for a vacation. Both of my parents and all of my siblings live in the United States. I met my wife in the United States in 1978, when we were both teenagers. We have been together ever since. We have been married for more than 20 years. We have 3 sons. All of them were born in the United States. Everything important in my life is here."

The Supreme Court denied the CPL 440.10 motion without a hearing. This Court granted the defendant's motion for leave to appeal from the order denying the CPL 440.10 motion, and subsequently consolidated the appeals from the judgment of conviction and the order. We now reverse the order, and remit the matter to the Supreme Court for a hearing on the defendant's motion.

The Sixth Amendment to the United States Constitution secures a criminal defendant's right to counsel, which is es-

sential "to protect the fundamental right to a fair trial" (*Strickland v Washington*, 466 US 668, 684 [1984]). "That a person who happens to be a lawyer is present . . . alongside the accused, however, is not enough to satisfy the constitutional command" (*id.* at 685). Rather, the right to counsel is understood as the right to the effective assistance of counsel (*id.* at 686; *see Roe v Flores-Ortega*, 528 US 470, 477 [2000]). A defendant is entitled to such effective assistance of competent counsel "[b]efore deciding whether to plead guilty" (*Padilla v Kentucky*, 559 US at —, 130 S Ct at 1480). Indeed, the effective assistance of counsel is imperative in the prepleading stage because the decision to plead guilty, and thereby forfeit many of the rights guaranteed by the United States and New York Constitutions, " 'is ordinarily the most important single decision in any criminal case' " (Chin and Holmes, *Effective Assistance of Counsel and the Consequences of Guilty Pleas*, 87 Cornell L Rev 697, 698 n 1, quoting Anthony G. Amsterdam, Trial Manual of the Defense of Criminal Cases § 201 [4th ed 1984]; *see Missouri v Frye*, 566 US —, 132 S Ct 1399, 1407-1408 [2012]).

█ In order to prevail on a claim that, prior to deciding whether to plead guilty, a defendant was deprived of the right to the effective assistance of counsel under the United States Constitution, he or she must meet the two-part standard set forth in *Strickland v Washington* (466 US at 688; *see People v McDonald*, 1 NY3d 109, 113 [2003]). Under the first prong of that standard, the "defendant must show that counsel's representation fell below an objective standard of reasonableness" (*Strickland v Washington*, 466 US at 688; *see People v McDonald*, 1 NY3d at 113). The second prong "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process" (*Hill v Lockhart*, 474 US 52, 59 [1985]; *see People v McDonald*, 1 NY3d at 114).

With respect to the first prong of the *Strickland* standard, prior to the United States Supreme Court's decision in *Padilla*, it was the law of this state that defense counsel was not under a duty to advise defendants of the removal consequences of a plea of guilty because such consequences were deemed to be " 'collateral' " to the sentence (*People v Ford*, 86 NY2d 397, 403 [1995], quoting *Fruchtman v Kenton*, 531 F2d 946, 948 [1976], *cert denied* 429 US 895 [1976]; *see People v McDonald*, 1 NY3d at 114). Thus, prior to *Padilla*, defendants could only assert valid ineffective assistance claims where their attorneys had provided them with affirmatively incorrect advice regarding re-

moval consequences (*see People v McDonald*, 1 NY3d at 114-115; *People v McKenzie*, 4 AD3d 437, 439 [2004]).

In *Padilla*, however, the Supreme Court noted that it had "never applied a distinction between direct and collateral consequences," and concluded, in any event, that such a distinction was "ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation" (*Padilla v Kentucky*, 559 US at —, 130 S Ct at 1482). The Court went on to determine that the weight of professional norms prevailing for at least the last 15 years, as well as "longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country[,] demand[ed] no less" than imposing a duty upon counsel to inform defendants of removal consequences of guilty pleas (559 US at —, 130 S Ct at 1486). Accordingly, the Court held that where an attorney fails to advise a criminal defendant, or misadvises the defendant, regarding clear removal consequences of a plea of guilty, his or her representation falls below an objective standard of reasonableness (559 US at —, 130 S Ct at 1482-1483, 1486; *see People v Marino-Affaitati*, 88 AD3d 742, 743 [2011]).[1]

Here, it is undisputed that the defendant's plea of guilty exposed him to mandatory removal from the United States (*see* 8 USC § 1227 [a] [2] [B] [i]; § 1101 [a] [48] [A]). Nonetheless, the defendant averred, his attorney never mentioned that pleading guilty bore any immigration consequences, an assertion which was also confirmed by the averment of the defendant's wife that she and the defendant were completely ignorant of those consequences at the time of the defendant's plea of guilty. The defendant and his wife further asserted that, even when the defendant subsequently received the immigration detainer, they were unaware that the defendant's plea of guilty exposed him to removal, thinking only that the detainer was a minor matter involving the defendant's "green card." It was not until the defendant's wife consulted with an immigration attorney that they learned the import of the plea of guilty as it related to the defendant's immigration status. The averments of the defendant and his wife are further supported by the statements of the

---

1. We are not faced here with the question of whether the rule set forth in *Padilla* is retroactive. As the People correctly concede, the defendant is entitled to application of *Padilla* because his direct appeal was pending at the time the decision in that case was rendered (*see Griffith v Kentucky*, 479 US 314, 328 [1987]; *People v Hardy*, 4 NY3d 192, 197 [2005]).

attorney who represented the defendant at sentencing. That attorney, who was employed by the same office as the attorney who represented the defendant during the plea proceedings, advised the Supreme Court that the defendant had been unaware of any removal consequences at the time of his plea. (Since the attorney who represented the defendant during the plea proceedings died prior to the filing of the instant motion, that attorney could neither affirm nor rebut the contentions of the defendant and his wife as to any failure to advise the defendant of the removal consequences of his plea.)

■ Significantly, the People do not challenge, on appeal, the defendant's assertion that his attorney failed to advise him of the removal consequences of his plea. Rather, observing that the defendant never alleged that he informed his defense counsel of his immigration status at the time of the plea proceedings, the People contend that where "a client has failed to inform his attorney that he is a non-citizen, counsel has no duty to give advice regarding immigration consequences." This contention, however, is logically flawed, as it presupposes that the defendant understands that his immigration status is relevant to the criminal proceedings. Absent such knowledge, a defendant would have no particular reason to affirmatively offer information regarding his or her immigration status to counsel. In fact, it is precisely because criminal convictions may bear adverse immigration consequences that the United States Supreme Court has held that defense counsel is duty bound to so advise the client (*see Padilla v Kentucky*, 559 US at —, 130 S Ct at 1486). Accordingly, to require that defendants apprehend the relevance of their noncitizenship status, and affirmatively provide this information to counsel, would undermine the protection that the *Padilla* Court sought to provide to noncitizen defendants. Indeed, it would lead to the absurd result that only defendants who understand that criminal convictions can affect their immigration status would be advised of that fact.[2]

■ Accordingly, based upon the averments of the defendant and his wife that defense counsel never mentioned any immigration consequences of a plea of guilty, as well as the statements of defense counsel at sentencing, we conclude that the defend-

---

2. The People do not argue, and there is no indication, that the defendant ever misrepresented or provided erroneous information regarding his immigration status to either counsel, the trial court, or the New York City Department of Probation (*cf. People v McLartey*, 32 Misc 3d 1201[A], 2011 NY Slip Op 51143[U] [Sup Ct, NY County 2011]).

ant sufficiently alleged that his counsel's performance fell below an objective standard of reasonableness so as to satisfy the first prong of the *Strickland* standard.[3]

To satisfy the second prong of the *Strickland* standard, also known as the prejudice prong, the defendant must show that " 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial' " (*People v McDonald*, 1 NY3d at 115, quoting *Hill v Lockhart*, 474 US at 59). In the context of a *Padilla* claim, the defendant "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances" (*Padilla v Kentucky*, 559 US at —, 130 S Ct at 1485).

In the present case, the Supreme Court, Kings County, summarily denied the defendant's motion, based upon its conclusion that the defendant failed to sufficiently allege that he was prejudiced by his counsel's deficient representation. In this regard, the trial court determined that the defendant's only "viable alternative" was to plead guilty, or, in other words, that it would not have been rational for the defendant to have rejected the plea offer. This conclusion was based, in large part, upon the apparently compelling evidence against the defendant, the prolonged prison term he faced if convicted after trial, and the fact that, at the time he pleaded guilty to the instant offense, the defendant was already at risk of removal from the United States for his prior conviction.

Preliminarily, to the extent that the defendant argues, the People concede, and the trial court found that the defendant was not subject to mandatory removal for his prior conviction, but, rather, qualified for a discretionary waiver of deportation in connection with that conviction under former section 212 (c) of the Immigration and Nationality Act of 1952 (8 USC former § 1182 [c]), they are incorrect. That provision, as interpreted by the Board of Immigration Appeals, gave the United States At-

---

**3.** We note that, when the law as to immigration consequences "is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences" (*Padilla v Kentucky*, 559 US at —, 130 S Ct at 1483; *see People v Marino-Affaitati*, 88 AD3d at 743-744). Here, however, the relevant immigration statute (*see* 8 USC § 1227 [a] [2] [B] [i]) is the same statute that was applicable in *Padilla v Kentucky*, and which the Supreme Court found was "succinct, clear, and explicit" (*Padilla v Kentucky*, 559 US at —, 130 S Ct at 1483). In any event, according to the averments of the defendant and his wife, defense counsel did not meet even the lower burden placed upon attorneys where the law is unclear.

torney General "broad discretion" to grant a waiver of deportation for certain aliens who committed deportable offenses (*INS v St. Cyr*, 533 US 289, 294 [2001]; *see* 8 USC former § 1182 [c] [repealed]; *Garcia-Padron v Holder*, 558 F3d 196, 199 [2009]). Effective April 24, 1996, that section was amended by section 440 (d) of the Anti-Terrorism and Effective Death Penalty Act of 1996 (hereinafter AEDPA), so as to prohibit discretionary waivers of deportation for aliens, like the defendant, convicted of, inter alia, drug-related offenses (*INS v St. Cyr*, 533 US at 297, 297 n 7; *see* Pub L 104-132, § 440 [d], 110 US Stat 1214, 1277; *Garcia-Padron v Holder*, 558 F3d at 200). Finally, the Illegal Immigration Reform and Immigrant Responsibility Act (hereinafter IIRIRA), effective April 1, 1997, repealed former section 212 (c), and replaced it with a new statute permitting the Attorney General to cancel removal for "a narrow class" of deportable aliens, which does not include aliens, like the defendant, convicted of aggravated felonies (*INS v St. Cyr*, 533 US at 297; *see* Pub L 104-208, div C, tit 3, § 304 [b], 110 US Stat 3009-597; 8 USC § 1229b [a]; *Garcia-Padron v Holder*, 558 F3d at 200). ("Aggravated felony" is defined to include "illicit trafficking in a controlled substance [as defined in 21 USC § 802], including a drug trafficking crime [as defined in 18 USC § 924 (c)]" [8 USC § 1101 (a) (43)].)

In *St. Cyr*, the United States Supreme Court considered the question of whether the application of the statutory restrictions on discretionary waivers of deportation, to aliens who pleaded guilty when such waivers were still available, would produce an impermissible retroactive effect on those individuals (*see INS v St. Cyr*, 533 US at 320). The Court answered the question in the affirmative, reasoning that alien defendants who pleaded guilty prior to the enactment of the statutory restrictions on discretionary relief undoubtedly relied upon the availability of such relief in deciding to plead guilty (*id.* at 323-324). It would thus be "contrary to 'familiar considerations of fair notice, reasonable reliance, and settled expectations,' to hold that IIRIRA's subsequent restrictions deprive them of any possibility of such relief" (*id.* [citation omitted], quoting *Landgraf v USI Film Products*, 511 US 244, 270 [1994]). Accordingly, the Court held that relief under former section 212 (c) remained available for aliens "whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212 (c) relief at the time of their plea *under the law then in effect*" (*INS v St. Cyr*, 533 US at 326 [emphasis added]).

The defendant in *St. Cyr*, who the Court concluded remained eligible for relief under former section 212 (c), pleaded guilty in March 1996, prior to the effective dates of both AEDPA and IIRIRA (*id.* at 314). In contrast, the defendant in this case pleaded guilty to attempted criminal sale of a controlled substance on January 3, 1997, and was sentenced on February 11, 1997. Thus, he pleaded guilty after the effective date of AEDPA, but before the effective date of IIRIRA. Since section 440 (d) of AEDPA eliminated discretionary relief from deportation for aliens convicted of drug-related offenses (*id.* at 297, 297 n 7; *see* Pub L 104-132, § 440 [d], 110 US Stat 1214, 1277; *Garcia-Padron v Holder*, 558 F3d at 200), the defendant would not have been eligible for section 212 (c) relief at the time of his plea "under the law then in effect" (*INS v St. Cyr*, 533 US at 326). Indeed, for that reason, the defendant could not have relied upon the availability of section 212 (c) relief in deciding to plead guilty, and, consequently, " 'considerations of fair notice, reasonable reliance, and settled expectations' " are not implicated here (*id.* at 323, quoting *Landgraf v USI Film Products*, 511 US at 270).

The holding in *St. Cyr* is incorporated in 8 CFR 1212.3, which concerns, inter alia, the availability of section 212 (c) relief to aliens who pleaded guilty to deportable offenses between April 24, 1996, and April 1, 1997. Specifically, that regulation provides:

> "an eligible alien may apply for relief under former section 212(c) of the Act, *as amended by section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996*, with respect to a conviction if the alien pleaded guilty . . . and the alien's plea agreement was made on or after April 24, 1996, and before April 1, 1997" (8 CFR 1212.3 [h] [2] [emphasis added]).

Here, at the time the defendant pleaded guilty, section 212 (c), as amended by section 440 (d) of AEDPA, did not afford the defendant an opportunity to obtain a discretionary waiver of deportation.[4]

Consequently, under the law in effect at the time of the defendant's plea of guilty on his prior conviction, he was subject

---

4. The defendant does not argue that, while he pleaded guilty well after the effective date of AEDPA, his "plea agreement was made" (8 CFR 1212.3 [h] [2]) prior to its effective date.

to mandatory removal for that conviction (*see Khan v Ashcroft*, 352 F3d 521, 523 [2003] [AEDPA § 440 (d) permissibly applied to alien who pleaded guilty in November 1996, i.e., after that section became effective, but before the effective date of IIRIRA]; *Oguejiofor v Attorney Gen. of U.S.*, 277 F3d 1305, 1309-1310 [2002]; *Domond v United States Immigration & Naturalization Serv.*, 244 F3d 81, 85-86 [2001]; *Smith v United States Dept. of Justice*, 218 F Supp 2d 357, 362 [2002]).

Nonetheless, neither the fact that the defendant had previously been convicted of a removable offense, nor the seemingly strong evidence against him with respect to the instant offense, nor the favorable plea bargain he received, necessarily requires a finding that the defendant was not prejudiced by his counsel's failure to advise him of the removal consequences of his plea. The determination of whether to plead guilty is a calculus, which takes into account all of the relevant circumstances. The People's evidence against a defendant, potential sentences, and the effect of any prior convictions are but factors in this calculus. For a citizen defendant, the strength of the People's evidence and the potential sentence in the event of conviction likely bear the greatest weight in a decision of whether to accept a plea offer. However, removal from the United States is a unique consequence of a criminal conviction (*see Padilla v Kentucky*, 559 US at —, 130 S Ct at 1482). "[T]he equivalent of banishment or exile" (*Delgadillo v Carmichael*, 332 US 388, 391 [1947]), it is "a particularly severe penalty" (*Padilla v Kentucky*, 559 US at —, 130 S Ct at 1481 [internal quotation marks omitted]). Especially for "the alien who has acquired his residence here," the "stakes are . . . high and momentous" (*Delgadillo v Carmichael*, 332 US at 391). As such, the United States Supreme Court has recognized that " '[p]reserving [a noncitizen defendant's] right to remain in the United States may be more important to [him or her] than any potential jail sentence' " (*Padilla v Kentucky*, 559 US at —, 130 S Ct at 1483 [some internal quotation marks omitted], quoting *INS v St. Cyr*, 533 US at 322 [recognizing the acute significance alien defendants place on immigration consequences when deciding whether to enter into plea agreements]).

In light of the primary importance that aliens may place upon avoiding exile from this country, an evaluation of whether an individual in the defendant's position could rationally reject a plea offer and proceed to trial must take into account the par-

ticular circumstances informing the defendant's desire to remain in the United States. Those particular circumstances must then be weighed along with other relevant factors, such as the strength of the People's evidence, the potential sentence, and the effect of prior convictions. If, for example, an alien has significant ties to his or her country of origin, or has only resided in the United States for a relatively brief period of time, or has no family here, a decision to proceed to trial in lieu of a favorable plea agreement may be irrational in the face of overwhelming evidence of guilt and a potentially lengthy prison sentence (cf. *People v Gooden*, 34 Misc 3d 1210[A], 2012 NY Slip Op 50029 [U], *6 [Sup Ct, Bronx County 2012] ["(T)wo years before defendant's guilty plea, he voluntarily departed the United States with his father to Jamaica for the purpose of attending school . . . (I)f the defendant was willing to return to Jamaica with the plan of attending school there, it is more unlikely he would have decided to risk exposing himself to twenty-five years imprisonment when, by pleading guilty, he would receive four years and return to Jamaica at the age of 20"]). The circumstances of the present case, however, stand in stark contrast to those just posited.

Here, the defendant has alleged that he was born in Italy, left his country of origin when he was three years old, and has never returned. The defendant is now 50 years old, is a lawful permanent resident of the United States, and has resided in this country for over three decades. The defendant has been employed only in the United States. His entire family, including his wife, an American citizen to whom he has been married for more than 20 years, his three sons, also American citizens, his parents, and his siblings all reside in the United States. Based upon these alleged circumstances, the defendant averred that he never would have pleaded guilty had he known that removal from the United States was a mandatory consequence of that plea (cf. *People v McDonald*, 1 NY3d 109, 115 [2003] [defendant failed to sufficiently allege that he was prejudiced by his counsel's incorrect advice regarding deportation consequences where the defendant never alleged that he would not have pleaded guilty but for counsel's error]).

We conclude that the defendant's averments sufficiently alleged that a decision to reject the plea offer, and take a chance, however slim, of being acquitted after trial, would have been

rational[5] (*see United States v Orocio*, 645 F3d 630, 643-646 [2011]). The rationality standard set by the United States Supreme Court in *Padilla* does not allow the courts to substitute their judgment for that of the defendant. In applying that standard, we do not determine whether a decision to reject a plea of guilty was the best choice, but only whether it is a rational one.

In that regard, while the People's evidence here appears strong, they have a high burden of proof to obtain a criminal conviction, and it cannot be known at this juncture what weaknesses may have existed in their case. Moreover, under the circumstances, it would not have been irrational to reject the plea offer in light of the defendant's prior removable offense. Significantly, although the defendant was subject to mandatory removal for the 1997 conviction, no immigration detainer had been placed upon him for the prior conviction as of the time he pleaded guilty to the instant offense in 2001. Thus, although the defendant's removal from the United States due to the prior offense was possible, it was neither imminent nor inevitable.

Undoubtedly, the defendant, who faced a potential maximum prison term of 12½ to 25 years on the top counts of the indictment in the instant matter at the time he pleaded guilty, received a favorable plea bargain. Nevertheless, the decision to plead guilty is not confined to consideration of the potential maximum sentence. As the United States Supreme Court recognized, removal is "sometimes the most important part . . . of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes" (*Padilla v Kentucky*, 559 US at —, 130 S Ct at 1480). The instant case presents the quintessential situation with which it appears that the United States Supreme Court was concerned in *Padilla*, as it involves a defendant for whom exile could be worse than prison (559 US at —, 130 S Ct at 1477 [Padilla, a native of Honduras, had been a lawful permanent resident of the United States for more than 40 years]; *United States v Orocio*, 645 F3d at 645 [defendant "rationally could have been more concerned about a near-certainty of multiple decades of banishment from the United States than the possibility of a single decade in prison"]). Consequently, we cannot conclude on this record that the defendant suffered no prejudice due to his counsel's failure to warn him of the dire immigration consequences that flowed

---

5. We note that "the prejudice inquiry here does not necessitate a prediction analysis as to the likely outcome" of any trial against the defendant (*People v McDonald*, 1 NY3d 109, 115 [2003]).

from his decision to plead guilty (*see People v Reynoso*, 88 AD3d 1162, 1163-1164 [2011]; *People v Williams*, 72 AD3d 1347, 1347-1348 [2010]; *People v Marshall*, 66 AD3d 1115, 1116 [2009]; *People v McKenzie*, 4 AD3d 437, 439-440 [2004] [it was error to summarily deny a motion to vacate conviction on ground of ineffective assistance of counsel where defendant "explained with evidentiary detail why avoiding deportation was so important to him: his job, new wife, and children require(d) him to remain in the United States"]).

■ In so concluding, we reject the People's contention that it would have been irrational for the defendant to reject the plea agreement because he would have been more likely to avoid ICE's attention by taking a DTAP plea without prison time than if he were convicted after trial and sentenced to prison. Even if the defendant had obtained vacatur of his plea and dismissal of the indictment through successful completion of the DTAP program, he would still have been subject to mandatory removal from the United States based upon a drug-related "conviction," because "conviction," as defined by the relevant federal statute, includes the entry of a plea of guilty or admission to "sufficient facts to warrant a finding of guilt," where "adjudication of guilt has been withheld" (8 USC § 1101 [a] [48] [A] [i]; *see* § 1227 [a] [2] [B] [i]). Thus, taking the DTAP plea rendered the defendant mandatorily removable, whereas pleading not guilty, and forcing the People to prove his guilt beyond a reasonable doubt, would have given the defendant a chance at avoiding a "conviction" that subjected him to mandatory removal. In light of the defendant's particular circumstances, as just described, we cannot say that taking such a chance would have been irrational. Moreover, had the immigration consequences of the defendant's plea been factored into the plea bargaining process, defense counsel may have succeeded in obtaining a plea agreement that would not have borne the consequence of mandatory removal from the United States (*see Padilla v Kentucky*, 559 US at —, 130 S Ct at 1486).

■ We also reject the People's contention, and the Supreme Court's conclusion, that the defendant failed to sufficiently allege prejudice because he did not express any "concern" for the removal consequences of his plea at the time that he pleaded guilty. Such lack of concern may merely reflect the fact that the defendant was unaware of the removal consequences of his plea at the time he pleaded guilty, due to his counsel's failure to advise him of those repercussions.

Accordingly, the Supreme Court erred in summarily denying the defendant's motion to vacate the judgment of conviction (*see People v McKenzie*, 4 AD3d at 440; *see generally Padilla v Kentucky*, 559 US at —, 130 S Ct at 1486-1487).

■ The defendant also argues that he is entitled to vacatur of the judgment of conviction and withdrawal of his plea because he was never placed in an adequate drug treatment program as part of his DTAP plea, and that, as a consequence, the promise that induced him to plead guilty was not fulfilled. In particular, the defendant contends that he was in need not only of drug treatment, but treatment for mental health issues, which was never adequately provided to him. We disagree.

"It is implicit to a promise of drug treatment as an alternative to imprisonment that the defendant will have access to a facility suited to provide him or her with a reasonable opportunity to deal with the addiction and to satisfactorily complete a program designed to that end" (*People v Rodriguez*, 289 AD2d 512, 513 [2001]; *see People v Jackson*, 272 AD2d 342, 343 [2000]). Where the promise of adequate drug treatment is unfulfilled, the plea induced by that promise " 'either must be vacated or the promise honored' " (*People v Rodriguez*, 289 AD2d at 513, quoting *People v Jackson*, 272 AD2d at 343; *see People v Selikoff*, 35 NY2d 227, 241 [1974], *cert denied* 419 US 1122 [1975]; *People v Salgado*, 282 AD2d 765, 766 [2001]).

In *People v Rodriguez*, there existed a question of fact, which was not properly addressed in a hearing held by the Supreme Court, as to whether the promise of drug treatment as an alternative to prison was fulfilled (*see People v Rodriguez*, 289 AD2d at 513-514). In that case, defense counsel represented to the Supreme Court that a former counselor at the program to which the defendant had been referred had been incarcerated and charged with selling drugs to the program's patients (*id.*). Further, there were allegations of pervasive drug use at the facility (*id.*). These assertions, this Court determined, warranted further inquiry and a determination as to whether the defendant was afforded the benefit of his plea bargain.

This Court held, in *People v Jackson*, that the defendant did not truly receive the benefit of his plea agreement, and that he was consequently entitled to withdraw his plea (*see People v Jackson*, 272 AD2d at 342-343). In that case, the defendant had been placed in a drug treatment program that did not permit him to take Prozac for his preexisting psychiatric condition (*id.* at 342).

In contrast, here, the defendant was placed in a residential drug treatment program, which he completed, but he relapsed while receiving outpatient treatment. When the defendant was returned to court, the Supreme Court specifically recognized that the defendant needed not only "detox[ification]," but also "psych[iatric] assistance." Cognizant of that need, the Supreme Court thereafter placed the defendant in two residential treatment programs, where certain mental health conditions were diagnosed. The defendant completed both of these programs, but again relapsed during after-care. Under these circumstances, the defendant was given "a reasonable opportunity" to deal with his addiction and to satisfactorily complete the DTAP program (*People v Rodriguez*, 289 AD2d at 513; *cf. People v Jackson*, 272 AD2d at 343).

Accordingly, we reverse the order denying the defendant's motion to vacate the judgment of conviction, and remit the matter to the Supreme Court, Kings County, for a hearing on the issue of whether the defendant was denied the effective assistance of counsel due to his counsel's failure to advise him of the removal consequences of his plea of guilty.

The remaining contention raised by the defendant on direct appeal is without merit.

Accordingly, the judgment is affirmed, the order is reversed, on the law, and the matter is remitted to the Supreme Court, Kings County, for an evidentiary hearing on the motion in accordance herewith and a new determination on the motion thereafter.

DICKERSON, ENG and SGROI, JJ., concur.

Ordered that the judgment is affirmed; and it is further,

Ordered that the order is reversed, on the law, and the matter is remitted to the Supreme Court, Kings County, for an evidentiary hearing on the motion in accordance herewith and for a new determination on the motion thereafter.